In the ESTATE OF John Wain POPE
(Deceased), Respondent,

v.

Michael Warren HOOK B/N/F Deborah
Ann Booth, Appellant.

No. WD 34128.

Missouri Court of Appeals,
Western District.

April 24, 1984.

F. Randall Waltz, III, Barton & Waltz, Jefferson City, for appellant.

James F. Crews, Crews, Gaw & Pyle, Tipton, for respondent.

Before SOMERVILLE, P.J., and CLARK and BERREY, JJ.

BERREY, Judge.

Michael Warren Hook, by his next friend Deborah Ann Booth, filed a petition in the Circuit Court of Morgan County, Probate Division, seeking a declaration of paternity and determination of heirship. The petition alleges that Michael, now nine years old, is the son of Deborah (a/k/a Debbie) and deceased John Wain Pope—who quite coincidentally left an estate of almost $150,000.

Rebecah Terwelp was the first in a long procession of witnesses called by petitioner. She is the Chief of Medical Information Section, Harry Truman V.A. Hospital, Columbia, Missouri. Her testimony was limited to the introduction of certain records including the blood type of the deceased: type O, Rh positive. The records further revealed he was not married and listed no dependents.

Petitioner next called John Ralph Pope, grandfather of the deceased and administrator of his grandson's estate. Mr. Pope pursuant to subpoena duces tecum produced a number of photographs of his grandson including a Southwestern Bell Telephone employee identification card and a Missouri driver's license.

Mr. Pope acknowledged the photos, exhibits 2 through 11, looked like Wain, he could not identify exhibit 12, and thought exhibit 13 was John Wain Pope.

Mr. Pope was then requested to look at a young man present in court and identified as Michael. Counsel for plaintiff then asked, "Okay, now, does he resemble your son or your grandson?"; to which Mr. Pope replied, "Not whatever. He has black hair, black eyes. But the boy's looks concerned, no." The questioning continued:

Q. You do not admit that that may be your—or is your grandson?

A. I will not. No. I will not.

Q. And you see no resemblance whatsoever?

A. None whatever.

Mr. Pope further testified he had inventoried the contents of John Wain Pope's billfold and found no picture [presumably of Michael].

Next to testify for appellant was Eddie Boyd an inmate of Central Missouri Corrections Center, commonly known as the Church Farm, where he was serving time for stealing. He had known John Wain Pope for a "long time." He also knew Debbie, mother of Michael. He had double-dated with her and John Wain Pope. Boyd testified that Wain said, "he thought it might have been his. He never really admitted he was except he never really denied he wasn't." Boyd thought that Michael resembled John Wain Pope through the eyes, nose and mouth. Boyd thought John Wain Pope carried a picture of Michael. According to Boyd, Debbie never outright accused him [Boyd] of parentage *"but some people told me it was supposed to have been mine and the same people told me it was supposed to have been Wain's."* Boyd admitted that *"I guess nobody really knew whose it was"* (emphasis added). Boyd had never seen John Wain Pope with Michael, and only saw Michael once or twice before the trial. Finally, Boyd stated, "He never came basically out and out and said, you know, That's my boy, or something like that".

Donald Ray Branstetter was the next witness called by petitioner and he gave his address as an inmate of the Miller County Jail.

Branstetter knew John Wain Pope for ten to twelve years and saw him two or three times a month and then sometimes daily. He also knew Debbie who "used to be Debbie Hook" prior to her marriage. Wain "told me that they accused him of—

that being his kid, you know, and he told me he didn't know whether it was or not. That's all I—about all I know about it."

Branstetter viewed exhibits 2 through 13 and stated, "They've got the same features. But so does him and Debbie, I guess. You know, they've got—I guess you—you know they both—brown hair and brown eyes." He observed that, "Debbie and Wain could resemble each other too...."

Debbie testified that her blood type and Michael's blood type was A positive.

James Douglas Tucker, D.O., then testified that blood types AB and B in the child would disprove John Wain Pope as being the father. Counsel inquired of Dr. Tucker as follows:

Q. Okay. So there's various offshoots that would say no, but basically an A positive mother can have an A positive kid with just about anyone; isn't that correct?

A. Within the realm of probability there's a wide area, yes.

Paul Lynn Kays was called by petitioner. He testified he was a close friend of John Wain Pope for six years. He too advised that John Wain Pope had said, "that he was accused of having a son, and he said if he did have one, he wouldn't admit it. But he didn't know whether he did or not." He too was asked to characterize any resemblance between John Wain Pope and Michael Warren Hook. He responded, "Complexion and a little in the eyes.... It's been awhile." He also stated he never saw a child's picture in John Wain Pope's billfold.

Donald Ray Booth, husband of Debbie Booth, testified that he started going with Debbie right after Michael was born. He had known John Wain Pope for a couple of years before he met Debbie. According to Booth, "John admitted Mike was his boy." Further in his direct testimony he was asked, "What did he say to admit that Michael was his son." He answered, "It was just—It came out of a teasing, more or less. We was razzing him about it, and we

asked him and he at first didn't want to say nothing, but then when we started razzing him about it he more or less—He didn't deny it."

On cross examination Booth admitted that he, John Wain Pope, didn't come out and say yes he is my son. Booth admitted to supporting Michael to some extent since his marriage to Debbie; Michael spends a lot of time with his grandparents. Booth also testified John Wain Pope never supported him and never sent him birthday presents, Christmas gifts or other presents.

Brenda James then was called by petitioner. She was a friend of Debbie for seven years. She testified that when Debbie was a fifteen year old sophomore in high school she told her she was four months pregnant and that Wain Pope was the father.

John C. Pope, Wain's father, was called by petitioner and testified he had no photos of his son. He was asked by petitioner's attorney to view Michael and compare him to a photo of John Wain Pope as a child. He was then asked:

Q. Do they not appear to be almost twin brothers."

A. "No they don't. Not to my knowledge no, they don't.

Q. "Do you see any family resemblance at all, Mr. Pope, to this young man in the front row?"

A. "No I really don't."

Counsel persisted with this line of questioning and each time Mr. Pope denied any resemblance between his son and Michael.

Debbie was then recalled, and we near the end of this conundrum. Debbie, of course, names John Wain Pope as father of Michael over objection of defendant. She testified she was a virgin before "making love 'once' to Wain Pope." She first told John Wain Pope he was the father of Michael Warren Hook when Michael was three years old. Subsequently, she gave John Wain Pope a picture of Michael for his billfold. John Wain Pope never paid support for Michael. Not surprisingly, ac-

cording to Debbie, Michael resembled John Wain Pope.

Debbie stated she supported the child, received aid to dependent children and that she did not list John Wain Pope as father on the aid to dependent children form. She listed father unknown. She also did not list John Wain Pope as father on the birth certificate and never took Michael to see John Wain Pope.

The following cross examination is quoted in its entirety to give the readers a detailed overview of this interesting litigation:

Q. He never supported you in any way or the child; is that correct?

A. That's true.

Q. And that you felt that as long as he was living there was no reason for him to support unless he wanted to; is that correct?

A. I felt that was up to him.

Q. What changed this attitude? We're in Court today?

A. He's gone.

Q. He's dead so it makes no difference?

A. Well, what do you think? He's gone.

Q. He's gone so even though when he was alive he never was a parent to your child, you think that what he had should go for the support of that child; is that correct?

A. Well, he's seven years old. He's got ten more years to go that has—he to be raised.

Q. Un-huh. Now, did you read the Eldon paper when John Wain Pope received $140,000 under a jury award?

A. Yes, I did.

Q. Did you go to him after that and ask him for support of this child?

A. No, I didn't.

Q. You knew at that time though that he was financially able to give money, did you not?

A. Yes, I did.

Q. Why didn't you go to him?

A. Same reason.

Q. Debbie, was one of the reasons that he would have said, "No, that's not my child"?

A. No.

Q. Did you ever attempt to establish paternity when that man was alive by bringing an action to establish paternity?

A. No, I didn't.

Debbie told the Missouri Division of Family Services that she would not name the father because he had nothing to do with Michael and wouldn't admit he's the father and she didn't want to go to court to establish paternity or get support from him.

■ Petitioner for Point I alleges the trial court erred in sustaining respondent's motion to dismiss at close of petitioner's case. The motion to dismiss was sustained because "The petitioner ... failed to establish paternity by clear and convincing proof." Section 474.060(2)(2), RSMo 1981. It is abundantly clear and there is ample evidence to this effect, as the trial judge quite properly decided. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The court in *Citizens Insurance Company v. N.J.*, 543 S.W.2d 532 (Mo.App.1976), stated "[t]he circumstances of each case must be considered in determining the finality of the judgment entered below." Such study and consideration of the instant case fully supports the trial judge herein.

■ The petitioner alleges that the motion made by respondent at close of his case was a "Motion for a Directed Verdict." He is mistaken, it was a motion to dismiss. A motion for a directed verdict at close of petitioner's evidence has no place in a court tried case, *Hillman v. Hedgpeth*, 600 S.W.2d 625 (Mo.App.1980). The motion made at the close of petitioner's evidence in the instant case was a motion to dismiss and was proper. *Hillman v. Hedgpeth, supra* at 629.

The judge's docket sheet refers to a motion of dismissal at close of petitioner's case. The judge had written "directed ver-

dict," crossed it out and proceeded to refer to it as a motion for dismissal. The transcript also refers to the defendant making a "Motion to Dismiss at the close of the petitioner's case."

Attorney for petitioner is far afield when he argues that defendant sought a directed verdict. Such a statement is not in accordance with either the pleading or the trial transcript. The petitioner's own brief under Point II refers to the motion in question as a motion to dismiss.

Petitioner acknowledges that the decision is, "going to have to end up being what you [Judge Bolinger] think is sufficient. Whether or not you feel in your own mind that this young man is the son of John Wain Pope and if you believe that he is then I think that you'll have to overrule Mr. Crews' motion." Whereupon the parties rested and the court sustained the defendant's motion to dismiss, the petitioner having failed to establish paternity by clear and convincing proof. § 474.060(2)(2), RSMo Supp.1983.

■ The court, according to appellant's Point II, erroneously dismissed the case because it applied a presumption against paternity thereby placing upon appellant a burden of proof exceeding the standard prescribed by § 474.060 of clear and convincing evidence. At trial, respondent argued:

> When Missouri changed their law concerning intestate succession by illegitimate children, of putative fathers, they use the words 'clear and convincing proof.' When using the terms 'clear and convincing proof' they made a statutory presumption that the child was not the child of the father. And it takes clear and convincing proof to overcome that presumption. It takes the same language as it over—takes to overcome the strongest presumption known under the law, namely the presumption of legitimacy.

Contrary to appellant's allegation the record does not indicate that the court imposed a burden of proof other than clear and convincing. Indeed, in granting respondent's motion the court stated:

> All right. The motion at the close of the petitioner's case will be sustained and the petition dismissed with the costs to petitioner. The Court feels that the petitioner has failed to establish paternity by clear and convincing proof.

Certainly any person would expect that Debbie would testify that deceased John Wain Pope was the father of Michael. In *Brown v. Brown*, 609 S.W.2d 223 (Mo.App. 1980), a dissolution case involving paternity of a child born during coveture, the court held that, "Where the evidence in a court-tried case is conflicting, the matter of creditability is for the trial court. Rule 73.-01(3)(b)."

The court did not erroneously declare or apply the law. *Murphy v. Carron, supra* at 32. Appellant's point is without merit.

■ For Point III petitioner alleges the trial court erred in not granting his motion for a new trial based on newly discovered evidence. The appellant cites *Everett v. Clinton County*, 282 S.W.2d 30 (Mo.1955), which holds that the reopening of the record in a court-tried case is discretionary with the trial court. And so it is!

The trial judge heard the case, saw the witnesses, viewed the exhibits and in his discretion overruled petitioner's motion for new trial. (No showing is made by petitioner that the trial judge abused his discretion).

■ Petitioner claims that he felt he had made a prima facie case, additional witnesses he had subpoenaed might show up and be used for rebuttal evidence, and the court's dismissal turned this strategy against petitioner thereby denying him the opportunity to present their evidence. Appellate courts should not serve as an advocate for a party by correcting or assisting litigants in rehabilitating a trial tactic gone awry. Cf. *Thummel v. King*, 570 S.W.2d 679, 686 (Mo. Banc 1978) (appellate brief did not advise court of the contentions asserted by appellant).

948

■ John Wain Pope died November 2, 1981. Letters were granted December 22, 1981. The petitioner filed this action February 23, 1982, and the matter went to trial July 6, 1982. Ample time existed for plaintiff to have properly prepared for this trial. His lack of preparation and failure to properly evaluate possible testimony and trial tactics is not a burden the defendant must assume.

Furthermore, an accurate resolution of a paternity claim and determination of heirship is enhanced by bringing the action during the alleged father's lifetime:

> the "availability [of the putative father] should be a substantial factor contributing to the reliability of the fact-finding process." *In re Lalli*, 38 N.Y.2d [77] at 82, 378 N.Y.S.2d [351] at 355, 340 N.E.2d [721] at 724. In addition, requiring that the order be issued during the father's lifetime permits a man to defend his reputation against "unjust accusations in paternity claims," .... The administration of an estate will be facilitated, and the possibility of delay and uncertainty minimized, where the entitlement of an illegitimate child to notice and participation is a matter of judicial record before the administration commences. Fraudulent assertions of paternity will be much less likely to succeed, or even to arise, where the proof is put before a court of law at a time when the putative father is available to respond, rather than first brought to light when the distribution of the assets of an estate is in the offing.

*Lalli v. Lalli*, 439 U.S. 259, 270, 271–272, 99 S.Ct. 518, 526, 58 L.Ed.2d 503 (1978).

The trial court did not abuse its discretion in denying appellant's supplemental motion for a new trial.

Judgment affirmed.

All concur.